1    Shaun P. Kenney, Arizona State Bar No.: 024439
2    THE KENNEY LAW FIRM, P.L.C.
3    485 South Main Avenue, Building 3
4    Tucson, Arizona 85701
5    (520) 884-7575
6    shaun@thekenneylawfirm.com

8    Stephen J. Cullen, *Pro Hac Vice Pending*
9    Kelly A. Powers, *Pro Hac Vice Pending*
10   Miles & Stockbridge P.C.
11   1201 Pennsylvania Avenue, N.W., Suite 900
12   Washington, D.C. 20004
13   (202) 465-8374
14   scullen@milesstockbridge.com
15   kpowers@milesstockbridge.com

17   *Attorneys for Petitioner*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| **Isaac Buahnik** | ) | NO.: |
| **502 Park Avenue** | ) | |
| **New York, NY 10022** | ) | |
| **(Temporary NY Address)** | ) | |
| | ) | **VERIFIED PETITION FOR** |
| **Hanita 35, Apt. 67** | ) | **RETURN OF CHILD** |
| **Neve Shaanan, Haifa, Israel** | ) | **TO ISRAEL AND FOR** |
| **(Registered Israel Address)** | ) | **ISSUANCE OF SHOW** |
| | ) | **CAUSE ORDER** |
| **Petitioner** | ) | |
| **v.** | ) | |
| | ) | |
| **Inbal Buahnik** | ) | |
| **8626 E. Plaza Avenue** | ) | |
| **Scottsdale, AZ 85250** | ) | |
| **(Last Known Address)** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

DATED this 29th day of December, 2021.

/s/ Shaun P. Kenney
Shaun P. Kenney, Attorney for Petitioner

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq.***

**INTRODUCTION**

1. This Verified Petition for Return (the "Petition") is filed as a result of the wrongful retention of the parties' nearly four-year-old daughter, M.B. born in 2017 (the "child"), in the United States from her habitual residence of Israel. The wrongful retention began on or about December 9, 2021.

2. The Petitioner, Isaac Buahnik (the "Father"), is the child's father. The Father is a dual citizen of Israel and the United States.

3. The Respondent, Inbal Buahnik (the "Mother") is the child's mother. The Mother is a dual citizen of Israel and the United States.

4. This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act[2] (hereinafter "ICARA").

---

[1] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10493 (1986).
[2] 22 U.S.C. 9001 *et seq*.

5. The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States of America and Israel on December 1, 1991.

6. The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

## JURISDICTION

7. This Court has jurisdiction under ICARA § 9003 because this case involves the retention of a child under the age of 16 in the United States from her habitual residence of Israel.

8. The child is currently located within the jurisdiction of this Court in the District of Arizona. The child is located in Maricopa County, Arizona with the Mother.

## FACTS

9. The Mother and Father first met in the summer of 2006 in Brooklyn, New York through a mutual friend. The Father lived in the United States at the time. The Mother lived in Israel at the time and was visiting the United States when the parties met.

1             10.    The parties began a long-distance relationship and visited each other in

2   Paris in 2007.

3             11.    The Father proposed to the mother on February 14, 2007, with a ring

4   the Father had worked with the Mother's mother to select.

5             12.    The parties were married on August 21, 2007 in Haifa, Israel in a

6   celebration at the Bikta Ba-Yaar and via the rabbanut, which is the Rabbinical Court

7   in Israel.

8             13.    The Mother obtained American citizenship after the parties' marriage.

9   The Father had previously filed to obtain his Israeli citizenship in 2003 during a

10   Birthright trip to Israel and obtained "new citizen" status. He later restored his

11   citizenship as a "new citizen" through an Israeli government program in 2011.

12            14.    After the parties' wedding, they lived together from 2007-2011 in

13   Brooklyn, New York and then in New London, Connecticut.

14            15.    During their time living together in the United States, the Father

15   focused on developing his career while the Mother focused on completing her

16   undergraduate university education. The Mother attended and graduated from

17   Southern Connecticut State University where she studied biology. The Father

18   worked at General Dynamics Electric Boat as a mechanical engineer.

16. In 2011, after the Mother had finished her undergraduate education, the parties moved to Israel. From 2011 through 2021, the parties lived together as a family in Israel, where they built a family life together.

17. From 2011 through the beginning of 2017, the parties focused on advancing their respective careers and on building a stable financial life for the family in Israel. Both parties completed graduate degrees in Israel in their respective fields. The Father worked at Wix, SimilarWeb, Yotpo, Bringg, and Rossum while in Israel. The Mother worked at LabGuru, Yopto, Woo.io, Houzz, ZoominSoftware, and Themis-Tech while in Israel.

18. In 2017, the parties decided together that they were ready to have children. The Mother became pregnant shortly after the parties' decision, and their daughter, M.B. was born in late 2017 in Israel. The Mother and Father are both named as the child's parents on the child's birth certificate.

19. After the child's birth, the family continued to live together in Israel.

20. After the child's birth, the Mother, Father, and the child continued to be engaged and active members of their local community in Israel. The parties and child have extended family and many friends in their community in Israel. The Mother's entire extended family, except for her sister, live in Israel.

21. After the child's birth, the child received medical care, vision care, dental care, and vaccinations in Israel. The Mother and Father also continued to

receive medical and dental care in Israel. The family have primary care physicians, dentists, and other healthcare providers in Israel.

22.    The Mother and Father each continued to work in their respective careers in Israel after the child's birth. After her maternity leave, the Mother returned to work in Israel in 2018. She then began a new employment position with Themis-Tech, an Israeli tech startup, in 2020.

23.    In 2018, the parties jointly purchased together a new construction condominium in Haifa, Israel for a purchase price of approximately 1,500,000 Israel New Shekels (approximately $481,000 United States Dollars as of December 29, 2021).

24.    In 2021, the Mother was offered a position with Themis-Tech in the company's Scottsdale, Arizona office in its Marble Law division.

25.    The parties discussed the Mother's career opportunity and the potential logistics for the family if the Mother accepted the position, including, but not limited to, preschooling arrangements for the child, the Father continuing to maintain his employment, and the family's living arrangements in Arizona. The parties only ever discussed living in Arizona together as an intact family.

26.    The Mother was excited about the opportunity to advance her career by potentially accepting the position and the Father fully supported the Mother's desire to advance her career.

27. The parties agreed that the Mother would accept the position in Arizona and that the family would move together to Arizona, where they would live together as an intact family.

28. The parties agreed that the Mother, Father, and child would live together in Arizona for the Mother's new employment position, initially in temporary accommodation while they located and purchased a home together in Arizona.

29. The parties agreed that the Father would maintain his Israeli employment during the family's time in Arizona. The Father works for a Czech startup company and is still required to be available during normal Israeli and Czech working hours. The Father therefore works from approximately 3:00 a.m. through approximately 3:00 p.m. Arizona time each day.

30. The parties did not cancel or sell their Israeli condominium contract. The construction on the new apartment building has not yet been completed.

31. After all of the logistical arrangements had been agreed between the parties and organized, the family travelled from Israel to Arizona in September 2021.

32. Almost immediately, the parties' plan for the family fell apart.

33. The shipment of the family's personal items from Israel was delayed by approximately a month-and-a-half.

34.     The child initially began attending preschool at La Petite Academy, which turned out not to be a good fit and did not work for the child and the family. The parties therefore withdrew the child from the preschool. The child stayed at the home with the Father during the day until the parties were able to enroll the child in a new preschool, Guidepost Montessori of North Scottsdale, in mid-October 2021.

35.     The child broke her leg playing on a trampoline, which created more stress and difficulty for the family.

36.     The child struggled, and continues to struggle, with integrating into preschool and social life in Arizona. Other than the Mother and Father, the child does not have any family in Arizona. The child has struggled to make friends in Arizona.

37.     On October 27, 2021, the parties signed a contract for the purchase of a home in Arizona. The closing on the purchase was scheduled for December 1, 2021. But in mid-November 2021, on the last day of the home inspection, the Mother backed the parties out of the contract, which caused the parties to lose the contract on the potential new family home.

38.     The Mother backing out of the contract on the potential new home was the final straw for the Father in trying to cope with the parties' plan falling apart.

39.     To assist the Father with the difficulty he was experiencing with the family's attempted transition to Arizona, on or about December 1, 2021, the Father's

company hired an Executive and Personal Assistant (the "nanny") for the Father, to work with the Father all seven days every week. Her duties include, *inter alia*, assisting with daily care for M.B., including preschool drop-off and pick-up.

40.     The parties and child continued to live together in the temporary rental property in Arizona.

41.     Throughout the end of November and early December 2021, the Father expressed to the Mother that her action with respect to backing out of the contract for the potential new home had substantially contributed to the stress in the family. The Father had been experiencing an episode of depression after the attempted transition to Arizona. The Father told the Mother about the extent of the depression he was experiencing and how it affected his daily living.

42.     The parties discussed at length the next steps for the family. The parties discussed each of their respective upcoming 2022 work-related travel requirements, how they would coordinate their respective travel schedules and caring for the child, the role the nanny would continue to play in assisting the family during the parties' respective travel obligations, how the parties would handle their 2021 income tax return filings, and other financial matters.

43.     In their discussions, the parties did not agree that they would live separately in Arizona. The parties did not agree on any conditions and circumstances

1  for the child to live in the United States other than with the parties together as an

2  intact family.

3      44.     On the morning of December 9, 2021, the Mother left the parties' home

4  with the child, rather than having the nanny handle the preschool drop-off. The

5  Father thought that was odd given they had just started working with the nanny, but

6  did not make an issue of it with the Mother. He continued to work his usual hours

7  that day.

8      45.     After the Father concluded his work day, which had started at

9  approximately 3:00 a.m., he went to the parties' bedroom to rest. The Mother and

10  child had not yet returned home from work and school. The Father fell asleep and

11  overslept until late that evening. When he woke up, the Mother and child were not

12  there. The Father checked his phone and discovered that the Mother had sent him an

13  email stating that she had left with M.B. and that they were not coming back.

14      46.     The Father then called and sent WhatsApp messages to the Mother

15  asking where they had gone. The Mother did not answer any of the Father's calls.

16  She sent the Father two WhatsApp messages telling the Father she had sent him an

17  email (which the Father had already seen) and that she would not speak to him by

18  phone and that M.B. was safe. The Mother claimed in her email to the Father that

19  she was afraid of him and that he had physically and psychologically abused her.

47. The Mother has refused, and continues to refuse, to tell the Father the exact address where she has moved with M.B.

48. The Father is aware through communications with the Mother that the Mother and M.B. continue to be located in the District of Arizona. The Father is also aware that the Mother works onsite at her company's office located in Scottsdale, Arizona.

49. The Mother has restricted the Father's access to M.B. to very limited video contact only.

50. The Father later learned that on December 14, 2021, the Mother filed a case against the Father in the Maricopa County Family Court. The case number is: FC2021-095735. The Father has not been served in the Mother's case. The court's online docket indicates that the Mother's case includes, *inter alia*, requests for legal decision making and physical custody. The Maricopa County Family Court does not have jurisdiction under Arizona's Uniform Child Custody Jurisdiction and Enforcement Act to make any child custody determinations with respect to M.B.

51. On December 21, 2021, the Father filed a divorce and custody case against the Mother in Israel in the Regional Rabbinical Court in Tel Aviv. The case number is: 1351556/1. The Mother was served with the Father's case on December 24, 2021. The Mother has retained counsel in the Israeli case and has submitted herself to the jurisdiction of the Israeli Rabbinical Court in Tel Aviv.

52. The Father is currently temporarily in New York. He travelled to New York after the Mother moved out with the child to seek legal advice and for support from family members who live in New York, given that the Mother has restricted the Father's access to M.B. to very limited video contact only.

53. As of December 28, 2021, the Mother continues to restrict the Father's contact with the child to video access only.

54. The Father never consented to the child living in the United States solely with the Mother.

55. The Father never consented to the child living in the United States in any framework other than the parties and child living together as an intact family.

56. The Father only ever consented to the child living in the United States with the parties together, as an intact family.

57. On December 29, 2021, the Father sent the Mother an email message reminding her of the conditions and circumstances under which he had agreed to the child living in the United States; namely, that the child would live with the parties together as an intact family.

58. The Mother's actions of taking the child from the family home, keeping the child from the Father, and filing a case against the Father in family court seeking legal decision making and physical custody of the child exceed the scope of the Father's consent for the child to be in the United States. The Father does not consent,

and never has consented, to the child living in the United States under the current conditions and circumstances.

## COUNT I – WRONGFUL RETENTION

59. The Father restates and re-alleges the allegations contained in Paragraphs 1 through 58 as if fully set forth herein.

60. The Hague Convention applies to cases in which a child under the age of sixteen (16) years has been removed or retained from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child.

61. The child is under the age of 16.

62. The habitual residence of the child is Israel and was Israel on the date the Mother retained the child in the United States.

63. From the totality of the circumstances perspective as of the date of retention on December 9, 2021, Israel is the child's home. The nearly four-year-old child has lived in Israel for her entire life other than the three month period between September 10, 2021 and the date of retention.

64. Israel is and always has been the child's ordinary home and holds a degree of settled purpose from the child's perspective. Throughout the child's life in Israel, the child has always been fully involved and integrated in all aspects of daily

and cultural life in Israel. The child has family and friends in Israel. The child has received routine medical, dental, and vision care in Israel.

65.     The Father is and always has been fully involved in the child's preschool life, community life, religious life, and family and social life from the time of the child's birth to the present. The Father actively participates, and always has actively participated, in decision making with respect to the child.

66.     The child has not integrated into life in the United States in the three months between September 10, 2021 and the date of retention. The child struggled, and continues to struggle, to adjust to preschool life in the United States. The parties withdrew the child from her first preschool after just a few weeks of attendance. The child then spent nearly a month-and-a-half at home all day with the Father. The parties enrolled the child in a new preschool, but she continues to struggle to acclimate to the new school and community and to make friends. Other than the Mother and Father, the child does not have any family in Arizona. Upon information and belief, the child has not attended preschool since the date of retention.

67.     The parties never had any agreement whereby the child would live in the United States under any conditions and circumstances other than the parties and child living together as an intact family.

68.　At the time the Mother retained the child in the United States from Israel, the Father had (and continues to have) rights of custody to the child under Israeli law by operation of law.

69.　There are no court orders entered by any court anywhere in the world relating to the parties' respective rights of custody to the child in this case.

70.　In Israel, pursuant to Section 14 of the Law of Legal Competence Guardianship (1962) (hereinafter, the "Law") both parents are the legal guardians of their minor children. This status continues until such time as there is a legal ruling determining otherwise, or there is an agreement by the parents approved by the court system determining otherwise.

71.　In *Ploni v. Ploni*, the Israeli Supreme Court has also held that along with guardianship over their minor children, both parents have legal custody over their minor children unless a judicial decision determines otherwise. In the same case, the Israeli Supreme Court explained that legal guardianship includes the obligations and rights connected with the needs of the child, including decision-making regarding the child's education and preparation for a trade. It further explained that legal guardianship also bestows upon the parents the right of custody over the child and the right to determine where the child will reside.

72. In accordance with the Law and Supreme Court case law in Israel, the Father and Mother are therefore the joint legal guardians of M.B. and both have custodial rights over M.B.

73. The Father has the rights of custody described above by operation of law, without any orders being entered relating to the child by any Israeli court, and he had these rights at the time of the Mother's retention of the child in the United States.

74. At the time of the Mother's retention of the child in the United States, the parties had (and continue to have) the joint legal guardianship and custodial rights over the child by operation of law in accordance with Israeli law as set forth above.

75. The rights and responsibilities of a person with joint guardianship rights and joint custodial rights as set out above under Israeli law necessarily involve the "care of the child" and are therefore rights of custody under Article 5*a* of the Hague Convention.

76. Joint guardianship rights and joint custodial rights as set out above are rights of custody under Article 5*a* of the Hague Convention.

77. The Father here, as a holder of joint guardianship rights and joint custodial rights under Israeli law, did not ever consent for the Mother to retain the child in the United States.

78.     The Father here, as a holder of joint guardianship rights and joint custodial rights under Israeli law, did not ever consent for the child to live in the United States under any conditions and circumstances other than the child living with the parties together as an intact family.

79.     The Mother's retention of the child in the United States is in breach of the Father's rights of custody under Israeli law and is therefore wrongful.

80.     Notice is given in this pleading that the Father is relying upon foreign law. Fed.R.Civ.P. 44.1.

81.     At the time of the Mother's retention of the child in the United States, the Father was actually exercising his rights of custody within the meaning of Articles 3 and 5a of the Convention, in that he is the father of the child and he has actively participated in every aspect of the child's life since the child's birth.

82.     The Father has promptly taken all legal steps available to him to seek the return of the child to Israel.

83.     The child is currently physically located within the District of Arizona with the Mother.

**COUNT II – ARTICLE 18 RETURN**

84.     The Father restates and re-alleges the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

85. The Father invokes Article 18 of the Convention, which grants this Court plenary power to order the child's return at any time.

## PROVISIONAL AND EMERGENCY REMEDIES[3]

86. The Father requests that the Court issue a Show Cause Order forthwith ordering the appearance of the Mother and child before this Court on the first available date on the Court's calendar, and directing the United States Marshals Service to serve the Show Cause Order on the Mother forthwith, and immediately take into safe-keeping all of the child's passports and other travel documents.

87. Unless this Court takes expedited action to issue the initial order requested by the Father, irreparable harm will occur to the well-being of the child in that she will continue to be deprived of her Father.

88. Service of the Show Cause Order and pleadings by the United States Marshals Service is necessary in this case because, upon information and belief, the Mother is concealing her exact location from the Father. The United States Marshals Service will therefore be most effective here in obtaining the Mother's exact address and ensuring the Mother does not abscond from this Court's jurisdiction with the child.

---

[3] This Court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition." ICARA § 9004.

89.     Pursuant to ICARA § 9004, in a proceeding for the return of a child, "[n]o court exercising jurisdiction … may … order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied." ICARA § 9004. In this case, the law referred to is that of Arizona.

90.     In Arizona, the Uniform Child Custody Jurisdiction and Enforcement Act (hereinafter "UCCJEA") is the source for statutory law governing, *inter alia*, the resolution of both domestic and international child custody disputes and is codified as the Arizona Revised Statutes, § 25-1001 *et seq.* Arizona law addresses the appearance of the parties and the child in such cases in § 25-1040(A) of the UCCJEA. That section authorizes this Court to order the appearance of the child and custodian or custodians *together*. *Id.* This Court therefore has the authority to issue a show cause order, ordering the appearance of the Mother and children in that the provisions of 22 U.S.C. § 9004 can be met.

## UCCJEA DECLARATION

91.     The details regarding the child that are required to be provided under the UCCJEA are as follows:

A.     The child is currently located with the Mother in the District of Arizona. Upon information and belief, the Mother and child are located in Maricopa County.

B. From September 10, 2021 until December 9, 2021, the child lived with the Father and Mother in Scottsdale, Arizona.

C. From the child's birth in 2017 until September 9, 2021, the child lived with both parties in Israel.

D. The Father does not have information of any custody proceeding concerning the child pending in any other court of this or any other State, except as set forth in this Verified Petition.

E. The Father does not know of any person or institution not a party to the proceedings that has physical custody of the child or claims to have rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with the child.

## NOTICE OF HEARING

92. Pursuant to 22 U.S.C. 9003(c), the parties will be given notice of any hearing in accordance with Arizona's UCCJEA.

93. The Father has incurred, and will continue to incur, reasonable and necessary attorneys' fees, expenses, and costs as a result of the wrongful retention of the child by the Mother.

94. The Father respectfully requests that this Court award him all of his reasonable and necessary reasonable and necessary attorneys' fees, expenses, and costs incurred in accordance with ICARA § 9007, upon the filing of a separate

motion for reasonable and necessary expenses and costs in accordance with the Federal Rules of Civil Procedure and this Court's Local Rules.

## RELIEF REQUESTED

**WHEREFORE**, the Father respectfully requests the following relief:

A.     That this Verified Petition for Return of Child to Israel be granted;

B.     That this Court issue a Show Cause Order in the form submitted herewith  scheduling an initial show cause and scheduling hearing on the first available date on the Court's calendar;

C.     That this Court's Show Cause Order be served upon the Respondent forthwith by the United States Marshal Service;

D.     That this Court grant any such further relief as justice and the Petitioner's cause may require.

## VERIFICATION

I declare under the penalty of perjury that the foregoing is true and correct. Executed on December 29, 2021.

Isaac Buahnik
*Petitioner*

/s/ Shaun P. Kenney
Shaun P. Kenney
THE KENNEY LAW FIRM, P.L.C.
485 South Main Avenue, Building 3
Tucson, Arizona 85701

(520) 884-7575
Arizona State Bar No.: 024439
shaun@thekenneylawfirm.com

Stephen J. Cullen, *Pro Hac Vice Pending*
Kelly A. Powers, *Pro Hac Vice Pending*
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
(202) 465-8374
scullen@milesstockbridge.com
kpowers@milesstockbridge.com

*Attorneys for Petitioner*